IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY J. SCHOLL, JR., : | |
|    Plaintiff, : | |
| : | |
| v. : | Case No. 2:25-cv-06257-JDW |
| : | |
| LAUREL HARRY, *et al.*, : | |
|    Defendants. : | |

## MEMORANDUM

Anthony J. Scholl, Jr., asserts claims against eighteen employees of the Pennsylvania Department of Corrections in both their individual and official capacities arising out of their placement of him in restricted housing and alleged uses of excessive force.[1] I will dismiss the Complaint, partially with prejudice and partially without prejudice. For the parts that I dismiss without prejudice, I will grant Mr. Scholl leave to file an amended complaint with additional factual details.

## I.  FACTUAL ALLEGATIONS

### A.  Pepper Spray Incidents

According to the Complaint and the grievance that Mr. Scholl filed (which he attached to the Complaint and which I will consider as part of the operative allegations),

---

[1] The named Defendants are Secretary of Corrections Laurel Harry, Executive Deputy Secretary Michael Wenerowicz, Lt. Martin, Correctional Officers Troutman, King, Stevenson, Clausen, and Ellard, Superintendent J. Terra, Regional Deputy Secretary Mr. Zaken, "Pysch Dr. Glashakow," and a "7 Man CERT Team."

one or more correctional officers pepper sprayed Mr. Scholl on February 4, 2025, February 26, 2025, and July 2, 2025.[2]

On February 26, 2025, Mr. Scholl was a transferee from SCI-Greene to SCI-Phoenix. Authorities stripped and body scanned him twice before he made it to the "strip cage." (ECF No. 2 at 12, 14.) He was ordered to strip again, and he refused, so members of the CERT team were called. They sprayed him twice in the face, handcuffed him, cut off his clothes, and twisted his ankle. When he pulled his foot away, they jumped on him and assaulted him. They then uncuffed him and left him in the cell overnight with no clothes and a broken toilet. He sustained injuries to his face, wrist, and ankles, as well as psychological trauma but received no treatment. Someone did wash his eyes, however.[3]

On March 10, 2025, Mr. Scholl submitted Grievance No. 1141091 to prison authorities at SCI-Phoenix, complaining about the incident on February 26, 2025. The grievance was rejected on initial review because it was not timely submitted, but the grievance was "forwarded to the Security Office and the PREA Compliance Manager for

---

[2] Sometimes, Mr. Scholl makes allegations about an incident that occurred on "7/2/2025," and other times about an incident that occurred on "2/7/2025." (ECF No. 2 at p. 6 (§§ IV.C., V).) Because Mr. Scholl lists this event last, after the one on February 26, 2025, and because he filed his grievance about that incident on July 3, 2025, I assume that it occurred on July 2, not on February 7.

[3] Because Mr. Scholl states his eyes were flushed, does not specify any other injury that required medical attention, and does not name any medical provider as a defendant, I understand the passing reference to receiving "no treatment" to be background information to his excessive force allegations, rather than an independent claim for deliberate indifference to his medical needs.

2

initiation of an investigation," given the allegation of sexual abuse. (*Id.* at 13.) Superintendent Terra denied Mr. Scholl's appeal on May 5, 2025. His final review was denied on June 17, 2025.

On July 2, 2025, someone took Mr. Scholl to the "POC"[4] against his will, threatening to take him to a mental hospital if he refused injections. Upon arrival at the POC, he was ordered to strip, but he refused. After a verbal altercation, someone "jumped" him and cut off his clothes. (*Id.* at 18.) He suffered injuries to his face, elbow, knee, and body when he was taken to the ground.

Mr. Scholl filed Grievance No. 1155453 on July 3, 2025, complaining about the events the day before. The facility grievance coordinators sent him two notices that the time to respond to the grievance would be extended to permit an investigation of his claims. Mr. Scholl sent requests to staff on August 22, 2025, September 2, 2025, and October 4, 2025, asking for the progress on his grievance. In response, he learned that the grievance was still pending and had been assigned as an excessive force claim that was being investigated.

On September 5, 2025, Mr. Scholl submitted an "Inmate's Request To Staff Member" to an unnamed "PREA Compliance Manager" for a copy of the Prison Rape Elimination Act investigation of the incident on February 26, 2025. The response, dated

---

[4] Mr. Scholl does not define a "POC." It might refer to a Psychiatric Observation Cell, but I can't be certain.

September 8, 2025, stated that Mr. Scholl was "not permitted to have the report for free and would have to pay for a copy." (*Id.* at 29.)

On September 29, 2025, Mr. Scholl submitted an "Inmate's Request To Staff Member" to Officer Troutman, asking "did you not pat search me on camera prior to cutting my clothes off in the POC?", to which Troutman responded "I patted inmate Mr. Scholl down in from [sic] of LC1103 before escorting him to Lt." (*Id.* at 30.) Mr. Scholl also made a request to Lt. Martin, asking if Lt. Martin ordered someone "to force me to go to the POC to meet Dr. Glashakow concerning an ultimatum over a [indecipherable] shot?" (*Id.* at 31.) Someone wrote on the form that Martin "refused to answer cellside on 10/6/2025." (*Id.*)

### B. Housing Status

In 2015, prison authorities placed Mr. Scholl in a secure residential treatment unit ("SRTU") following an incident in which Mr. Scholl's cellmate "was assaulted, ultimately leading to his death," along with a history of violent and aggressive behaviors." (*Id.* at 23.) In June 2023, prison officials transferred Mr. Scholl to SCI-Greene to participate in an SRTU there, but sometime after December 2023, officials at SCI-Greene concluded that he had begun to display "negative behaviors and showed a decline in out of cell participation." (*Id.*) Mr. Scholl was placed on the Restricted Release List ("RRL") in the intensive management unit ("IMU"). The IMU is a 4-year program that requires 18 months of misconduct-free behavior until an inmate is uncuffed. Prisoners in the IMU cannot

4

participate in religious observance like Mass, they do not get incidents like other inmates, they don't get contact visits or phone calls to maintain a relationship with their loved ones, and they lose other privileges. Mr. Scholl apparently appealed his placement on the RRL in the IMU. On March 25, 2025, Mr. Wenerowicz denied that appeal.

### C.     Procedural History

On October 31, 2025, Mr. Scholl filed a Complaint, a motion to proceed *in forma pauperis*, and a motion for appointment of counsel. In the Complaint, Mr. Scholl asserts claims under the First, Fourth, Eighth, and Fourteenth Amendment and the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

## II.    STANDARD OF REVIEW

A plaintiff seeking leave to proceed *in forma pauperis* must establish that he is unable to pay for the costs of his suit. *See Walker v. People Express Airlines, Inc.*, 886 F.2d 598, 601 (3d Cir. 1989). Where, as here, a court grants a plaintiff leave to proceed *in forma pauperis*, it must determine whether the complaint states a claim on which relief may be granted. *See* 28 U.S.C. § 1915(e)(2)(B)(ii). That inquiry applies the standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Pursuant to that standard, I must determine whether the Complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). That means I must accept the factual allegations in the Complaint as true, draw inferences in favor of the plaintiff, and determine whether there is a plausible claim. *See*

*Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021). Conclusory allegations do not suffice. *See Iqbal*, 556 U.S. at 678. When a plaintiff is proceeding *pro se*, I construe his allegations liberally. *See Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021).

### III.  DISCUSSION

#### A.  *In Forma Pauperis*

Mr. Scholl has completed paperwork, including a copy of his Prisoner Trust Fund Account statement, demonstrating that he lacks the assets or income to pay the required filing fees. I will therefore grant him leave to proceed *in forma pauperis*. Pursuant to the Prisoner Litigation Reform Act, Mr. Scholl must pay the filing fee in installments regardless of the outcome of this case. *See* 28 U.S.C. § 1915(b).

#### B.  **Plausibility Of Claims**

Mr. Scholl asserts constitutional and RLUIPA claims. The vehicle by which federal constitutional claims may be brought in federal court is 42 U.S.C. § 1983. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

##### 1.  **Official capacity claims**

Mr. Scholl seeks money damages against the DOC employees and has named them in their official as well as individual capacities. The official capacity claims for money damages are dismissed because states, their agencies, and state officials acting in their

official capacities are not considered "persons" for purposes of § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-66, 70-71 (1989). Also, the Eleventh Amendment bars suits against a state and its agencies in federal court that seek monetary damages. *See A.W. v. Jersey City Pub. Schs.*, 341 F.3d 234, 238 (3d Cir. 2003). Suits against state officials acting in their official capacities are really suits against the state. The Eleventh Amendment therefore applies to those claims, too. *A.W.*, 341 F.3d at 238; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Will*, 491 U.S. at 70-71. The Commonwealth of Pennsylvania has not waived that immunity. *See* 42 Pa. Cons. Stat. § 8521(b). Therefore, to the extent Mr. Scholl seeks money damages from any Defendant in his official capacity, the claim fails as a matter of law.

    **2.**  **Claims against Defendants with no personal involvement**

  A "defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). Mr. Scholl names Secretary of Corrections Laurel Harry, Correctional Officers King, Stevenson, Clausen, and Ellard, and "Pysch Dr. Glashakow" in the caption of his Complaint and the list of Defendants but makes no substantive allegations concerning their involvement in the incidents he describes. Any § 1983 claim against each of them is, therefore, not plausible.

  The only allegation concerning Superintendent Terra is that he denied Mr. Scholl's grievance about the way the CERT Team treated him. However, participation in the

grievance process does not, without more, establish involvement in the underlying constitutional violation. See *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020). Therefore, the claims against Superintendent Terra are also not plausible.

### 3. Claims based on housing status

#### a. Due process

An examination of a procedural due process claim under the Fourteenth Amendment proceeds in two steps. See *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972). First, the court must determine whether there exists a liberty or property interest with which the state has interfered. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1989). Second, if and only if a petitioner establishes the existence of a protected interest, the court must examine whether the procedures attendant upon that deprivation were constitutionally sufficient. *Id.*

In a conditions of confinement case, to "rise to the level of a liberty interest, the right alleged must confer 'freedom from restraint which ... imposes *atypical and significant hardship* on the inmate in relation to the ordinary incidents of prison life.'" *Williams v. Sec'y Pa. Dep't of Corr.*, 848 F.3d 549, 559 (3d Cir. 2017) (quotation omitted) (emphasis added). The determination of what is "atypical and significant" is based on the range of conditions an inmate "may reasonably expect to encounter as a result of his or her conviction." *Asquith v. Dep't of Corr.*, 186 F.3d 407, 412 (3d Cir. 1999). The Supreme Court has held that disciplinary segregation that mirrors the conditions of administrative

segregation and protective custody is not atypical, but the restrictive circumstances of a Supermax prison are. *Compare Sandin v. Conner*, 515 U.S. 472, 486 (1995) *with Wilkinson v. Austin*, 545 U.S. 209, 223-24 (2005).

In this Circuit, courts apply a "two-factor inquiry: (1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Williams*, 848 F.3d at 560 (quotation omitted). Courts have generally concluded that an initial placement on the RRL does not have due process implications. *See, e.g., Mack v. Clark*, No. 21-4, 2022 WL 2669510, at *7 (W.D. Pa. July 11, 2022); *Fraise v. Terhune*, 283 F.3d 506, 522 (3d Cir. 2002); *Torres v. Fauver*, 292 F.3d 141, 151 (3d Cir. 2002). In contrast, the Third Circuit has "concluded that 'virtual isolation for almost eight years' in solitary confinement created a protected liberty interest." *Williams*, 848 F.3d at 560. However, even if continued placement on an RRL is atypical, a prisoner's due process rights are satisfied where prison officials provide for periodic review of the prisoner's status. *See Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000).

Mr. Scholl's due process claim arises from Mr. Zaken's initial decision to place Mr. Scholl on RRL, which Mr. Wenerowicz affirmed. Because the initial placement in February 2025 did not implicate any due process concern, Mr. Scholl's claim is not plausible, regardless of whether he had an opportunity to hire counsel or call witnesses. I will

9

therefore dismiss the due process claims arising from that placement decision with prejudice.

### b. Eighth Amendment

Mr. Scholl's Eighth Amendment claim arises from his contention that the conditions of his confinement while on the RRL are atypical and harsh because he does not receive the same wages as other prison workers, the same unspecified "incentives," the ability to purchase items from vendors, contact visits or phone calls to maintain relationships, and strip searches. Unconstitutional punishment under the Eighth Amendment includes both objective and subjective components. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires an inquiry into whether "the deprivation [was] sufficiently serious" and the subjective component asks whether "the officials act[ed] with a sufficiently culpable state of mind[.]" *Id.* (citation omitted).

To meet the objective component, a prisoner must establish that prison officials' acts or omissions denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Such necessities include food, clothing, shelter, medical care, and reasonable safety. *Tillman v. Lebanon Cnty. Corr. Facility*, 221 F.3d 410, 418 (3d Cir. 2000). Conditions that are "restrictive and even harsh," but not cruel and unusual do not violate the Eighth Amendment; instead, they "are part of the penalty that criminal offenders pay for their offenses against society.'" *Rhodes*, 452 U.S. at 347. To meet the subjective component, a prisoner must assert that prison officials acted with

deliberate indifference, meaning that they consciously disregarded a serious risk to the detainee's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).

Mr. Scholl's assertion about pay rates for inmates cannot support his claim because inmates have no constitutional right to employment during incarceration. *See Watson v. Sec'y Pa. Dep't of Corr.*, 567 F. App'x 75, 78 (3d Cir. 2014) (*per curiam*). Restrictions on contact visits also do not implicate the Eighth Amendment. *See Overton v. Bazzetta*, 539 U.S. 126, 136 (2003). Mr. Scholl's assertions regarding restricted telephone privileges and restrictions on making purchases are also not objectively serious infringements.[5] *See Padilla v. Beard*, 206 F. App'x 123, 125 (3d Cir. 2006) (*per curiam*), *as amended* (Jan. 25, 2007) (telephone calls); *Keels v. Blanche*, No. 21-2271, 2022 WL 3350368, at *4 (E.D. Pa. Aug. 11, 2022) (purchases from commissary).

Finally, Mr. Scholl complains that strip searches of inmates on the RRL violate his Eighth Amendment rights. A claim concerning a strip search is cognizable under the Eighth Amendment, but only where it is alleged that the strip search was either physically or sexually abusive. *See, e.g.*, *Farmer v. Plumeri*, No. 22-957, 2023 WL 35869, at *2-3 (D.N.J. Jan. 4, 2023). Mr. Scholl does not allege he was subjected to searches that were sexually or physically abusive apart from his conclusory excessive force claim.

---

[5] Notably, the Third Circuit has also held that prisoners "have no right to unlimited telephone use, and reasonable restrictions on telephone privileges do not violate their First Amendment rights" either. *Almahdi v. Ashcroft*, 310 F. App'x 519, 522 (3d Cir. 2009) (*per curiam*).

### c. Fourth Amendment

Strip searches do not violate the Fourth Amendment, regardless of the reason for detention or the existence of reasonable suspicion that the individual is concealing something. *See Small v. Wetzel*, 528 F. App'x 202, 207 (3d Cir. 2013) (citing *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 328 (2012)). The Supreme Court has also held that prison officials may conduct visual body cavity searches without probable cause but only in a reasonable manner. *Bell*, 441 U.S. at 559-60. Ascertaining the reasonableness of prison security measures under the Fourth Amendment requires courts to consider "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.* at 559.

Mr. Scholl does not allege how he is strip searched while housed in the IMU, whether he is subjected to body cavity searches, or how any such actions lacked justification or were unreasonable.[6] He also does not allege that any named Defendant was personally involved in conducting unjustified or unreasonable searches. *See Rode*, 845 F.2d at 1207. For these reasons, any claim based on strip searches is dismissed. However, I will permit Mr. Scholl an opportunity to amend this claim if he is able to allege additional facts to show that he has been subjected to unconstitutional strip searches and name a defendant who was personally involved in the violation.

---

[6] Mr. Scholl attached a grievance to his Complaint discussing the frequency of strip searches that occurred during his transfer from SCI-Green to SCIP, but those allegations do not discuss his experiences in the IMU at SCIP.

### d. First Amendment/RLUIPA

The First Amendment guarantees that all prisoners have reasonable opportunities to exercise their religious freedom. *Cruz v. Beto*, 405 U.S. 319, 322 n. 2 (1972). But "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001). "[I]ncarceration almost always results in a narrowing, not a broadening, of constitutional protections." *Fraise*, 283 F.3d at 515 n.5. Thus, although inmates retain certain First Amendment protections, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone v. Est. of Shabazz*, 482 U.S. 342, 348 (1987) (quotations omitted).

The First Amendment free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden. *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 699 (1989) (internal citations omitted). Regulations reasonably related to legitimate penological interests generally pass constitutional muster. *See Turner v. Safley*, 482 U.S. 78, 84 (1987). Under *Turner*, courts consider four factors in making this determination:

> first, whether the regulation bears a "valid, rational connection" to a legitimate and neutral governmental objective; second, whether prisoners have alternative ways of exercising the circumscribed right; third, whether accommodating the right would have a deleterious impact on other

13

inmates, guards, and the allocation of prison resources generally; and fourth, whether alternatives exist that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."

*Fraise,* 283 F.3d at 513-14 (quoting *Turner*, 482 U.S. at 89).

Mr. Scholl's undeveloped allegation that he may not attend Mass and receive the Eucharist fails to allege any facts bearing on the *Turner* factors, particularly whether he lacks any alternative ways of exercising his faith or there is an absolute prohibition on his religious exercise. *See Davis v. Wigen*, 82 F.4th 204, 212 (3d Cir. 2023) ("There can hardly be a more substantial burden on a religious practice or exercise than its outright prohibition."). Therefore, his First Amendment free exercise claim cannot proceed as pled. The RLUIPA claim is also undeveloped and suffers from the additional defect that Mr. Scholl may not receive money damages as a remedy for its violation. *See Sossamon v. Texas*, 563 U.S. 277, 293 (2011). I will therefore dismiss those claims and give Mr. Scholl an opportunity to provide additional facts.

### D. Excessive Force Claims

The Eighth Amendment prohibits prison officials from unnecessarily and wantonly inflicting pain in a manner that offends contemporary standards of decency. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992). "Force that is used 'maliciously and sadistically for the very purpose of causing harm' violates the Eighth Amendment." *Young v. Martin*, 801 F.3d 172, 180 (3d Cir. 2015) (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). When screening an Eighth Amendment excessive force claim under § 1915, a court asks whether

the prisoner has alleged plausibly that the force was applied maliciously and sadistically to cause harm rather than in a good-faith effort to maintain or restore discipline. *See Hudson*, 503 U.S. at 7.

The factors used to determine whether the force applied was excessive include: (1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of injury inflicted; (4) the extent of the threat to the safety of staff and inmates, as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response. *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (quoting *Whitley*, 475 U.S. at 321). Although the extent of an inmate's injuries is relevant to an Eighth Amendment analysis, "there is no fixed minimum quantum of injury that a prisoner must prove that he suffered through objective or independent evidence in order to state a claim for wanton and excessive force." *Id.* at 104. Thus, the inquiry must be driven by the extent of the force and the circumstances in which it is applied, not by the resulting injuries. *Id.* at 108.

The Eighth Amendment does not protect against a *de minimis* use of physical force, so long as it is not of a sort "repugnant to the conscience of mankind." *Brooks*, 204 F.3d at 107 (quoting *Hudson*, 503 U.S. at 9-10). Sexual abuse and harassment violate an inmate's rights under the Eighth Amendment, which prohibits cruel and unusual punishment. *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) ("Whether sexual abuse of

inmates by prison officials offends the Eighth Amendment is a matter of first impression in our Court. Today, we join numerous sister Circuits in holding that prison sexual abuse can violate the Constitution."). Claims for sexual abuse and harassment are evaluated similarly to excessive force claims in that the prisoner must allege facts plausibly establishing both objective and subjective components. *Id.* at 475.

Mr. Scholl's allegation that the Defendant CERT Team members sprayed him in the face and cut off his clothes and "sexually assaulted" him lacks detail to determine whether it is viable. Mr. Scholl does not explain the need (or lack of need) for the use of pepper spray, and his allegation of sexual assault is conclusory. In addition, other than the CERT Team, Mr. Scholl does not allege that any Defendant was involved in the incidents on February 26 or July 2 (or any other incident involving the use of pepper spray). Without allegations of personal involvement, Mr. Scholl has not offered a basis to hold anyone other than the CERT Team members liable. *See Rode*, 845 F.2d at 1207. While he mentions Officer Troutman and Lt. Martin in the attached POC-related requests to staff, nothing in those submissions or the Complaint itself indicates either person was involved in a use of excessive force. I will therefore dismiss the excessive force claims and give Mr. Scholl an opportunity to amend these claims as well.

### IV.   CONCLUSION

I will grant Mr. Scholl leave to proceed *in forma pauperis* and dismiss his Complaint. I will dismiss the following claims with prejudice: (1) all official capacity claims for money

damages; (2) any claim against Superintendent Terra based on his handling of a grievance; (3) all claims against Messrs. Zaken and Wenerowicz based on Mr. Scholl's placement on the RRL; and (4) all Eighth Amendment claims involving inmate pay, contact visits, the use of telephones, and the ability to make purchases. I will dismiss the following claims without prejudice: (1) the Eighth Amendment claim based on strip searches; (2) the First Amendment and RLUIPA claims; (3) the excessive force claims; and (4) all claims asserted against Secretary of Corrections Laurel Harry, Correctional Officers King, Stevenson, Clausen, and Ellard, and "Pysch Dr. Glashakow." I will deny Mr. Scholl's motion to appoint counsel as premature. An order providing Mr. Scholl with information about filing an amended complaint follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
**JOSHUA D. WOLSON, J.**

December 17, 2025